## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE MAJESTIC STAR CASINO, LLC, *et al.*, | ) Case No. 09-14136(KG) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| ——————————————— | ) |
| THE MAJESTIC STAR CASINO, LLC, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Adv. Pro. No. 10-56238 (KG) |
| | ) |
| BARDEN DEVELOPMENT, INC., DON H. | ) |
| BARDEN, JOHN M. CHASE, JR.,[1] UNITED | ) |
| STATES OF AMERICA ON BEHALF OF | ) |
| THE INTERNAL REVENUE SERVICE, | ) |
| AND STATE OF INDIANA | ) |
| DEPARTMENT OF REVENUE, | ) |
| | ) |
| Defendants. | ) **Re: D.I. Nos. 1, 23, 33, 34, 43, 49, 51** |
| ——————————————— | ) |

### MEMORANDUM OPINION[2]

---

[1] Defendant John M. Chase, Jr. has been substituted for the estate of Defendant Don. H. Barden pursuant to Rule 25 of the Federal Rules of Civil Procedure made applicable by Rule 7025 of the Federal Rules of Bankruptcy Procedure, and this Court's Order approving the substitution (D.I. 79) entered on July 28, 2011. Mr. Chase is the trustee and personal representative of Defendant Barden's estate.

[2] For purposes of the Motion to Dismiss and motion for judgment on the pleadings, "The court is not required to state findings or conclusions when ruling on a motion under Rule 12 . . . ." Fed. R. Bankr. P. 7052(a)(3). Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure. With respect to the Motion for Summary Judgment, this Opinion constitutes the findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052. To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

The Court has before it the Majestic Star Casino, LLC's and affiliated entities' ("Debtors") Motion for Summary Judgment Against All Defendants (the "Summary Judgment Motion") (D.I. 43) on Counts I and II of the Debtors' Complaint filed in the above captioned adversary proceeding on December 31, 2010 (the "Complaint") (D.I. 1). The Debtors' seek to avoid a transfer and disposition of alleged property of the estate under §§ 549, 550 and 362 of title 11 of the United States Code (the "Bankruptcy Code"). Defendant United States of America on Behalf of the Internal Revenue Service (the "IRS") filed its Motion to Dismiss on February 14, 2011 (the "Motion to Dismiss") (D.I. 23). Defendants Don H. Barden ("Barden") and Barden Development, Inc. ("BDI"), filed their joint Motion for Judgment on the Pleadings and Memorandum in Support on February 28, 2011 (D.I. 33, 34). The Debtors filed their Summary Judgment Motion on March 16, 2011. Thereafter, Defendant Indiana Department of Revenue filed its Opposition to Debtor-Plaintiff's Motion for Summary Judgment Against All Defendants on April 13, 2011 (D.I. 49). The Court heard oral argument on July 29, 2011. At issue is whether a non-debtor parent's revocation of its "S" corporation status, which subsequently by operation of the Internal Revenue Code, 26 U.S.C. § *et. seq.* (the "IRC") revoked the debtor-subsidiary's "qualified subchapter "S" subsidiary" ("QSub") status, is an avoidable transfer of estate property in violation of Bankruptcy Code § 549. The Court must first determine whether the Debtors' QSub status is property of the estate. For the reasons discussed below, the Court will grant the Debtors' Motion for Summary Judgment, and deny both Defendants BDI and Barden's Motion for Judgment on the Pleadings, and the IRS's Motion to Dismiss.

## I.  JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.  FACTS

Founded in 1993, the Debtors operate as a multi-jurisdictional gaming company that owns casino properties in Indiana and other states.  Compl. at ¶ 10.  Defendant BDI is the non-debtor parent of the Debtors, including The Majestic Star Casino, II ("MSC II").  Compl. at ¶¶ 2, 16.  Prior to and as of November 23, 2009, (the "Petition Date"), BDI was classified as an "S" corporation under subchapter S[3] of the IRC and, effective 2005, BDI elected to classify its wholly-owned subsidiary, MSC II, as a QSub[4]. *Id.* at ¶ 2. Defendant Barden is the sole shareholder of BDI and is the President and Chief Executive Officer of MSC II. *Id.* at ¶ 12.

Because it was a QSub, MSC II was not required to pay federal and state income

---

[3] The operations of an "S" corporation are subject to only one level of taxation.  Its income and losses are passed through to its shareholders and the corporation itself is generally exempt from the taxes imposed under chapter 1 of the IRC.  The same is true of a QSub. A "C" corporation, by contrast, is subject to two levels of taxation.  Its net income is subject to tax at the corporate level and any distributions made by the corporation to its shareholders are subject to a second level of tax.

[4] To qualify as a QSub, the entity must be a domestic corporation that is wholly-owned by an "S" corporation and one which the "S" corporation elects to treat as a QSub. *See* 26 U.S.C. § 1361(b)(3)(A). Although BDI owns the stock of MSC II through two intermediate entities - Majestic Holdco and The Majestic Casino, LLC (Bennett Affidavit at ¶¶ 5-7)- these two entities are disregarded for federal income tax purposes, and BDI is treated as the direct owner of MSC II. 26 C.F.R. § 301.7701-3(b). Therefore, MSC II met the requirements for Qsub status.(Bennett Affidavit at ¶¶ 3-8).

taxes on its net taxable income under chapter 1 of the IRC and chapter 2 of the Indiana Code. *Id.* at ¶¶ 2, 17-20. *See* 26 U.S.C. §§ 1361(b)(3)(A), 1362(a), 1366(a)-(b); Ind. Code § 6-3-2-2-8(2); 26 C.F.R. § 1.1361-(4)(a). Additionally, MSC II was not required to file income tax returns separate from BDI. Compl. at ¶ 2 n.2. Instead, since a QSub is treated as a flow-through entity, BDI's income tax return included all items of income or loss generated by MSC II. *Id.* Although this income and loss must be reported on its tax return, an "S" corporation like BDI generally is not required to pay tax on such income; rather, the items of income and loss are reported on the personal tax return of the "S" corporation's shareholders (in this case, BDI's sole shareholder, Barden), who may be required to pay tax on the income. *Id.* at ¶ 2 n.2. *See* 26 C.F.R. § 1.1366-1(a).

On the Petition Date, both BDI and MSC II retained their status as an "S" corporation and QSub, respectively. Compl. at ¶¶2, 17, 30. After the Petition Date, but before March 16, 2010, BDI filed a notice with the IRS revoking its status as an "S" corporation as of January 1, 2010 (the "Revocation"). *Id.* at ¶ 21. As a result, U.S. Treasury regulations dictated that, MSC II's QSub status was automatically terminated as of the end of the prior tax year,[5] December 31, 2009, and both BDI and MSC II became "C" corporations as of January 1, 2010. *Id.* at ¶ 21. 26 U.S.C. §§ 1361(b)(3)(B)-(C), 1362(d); 26 C.F.R. §§ 1.1361-4(a), 1.1361-5(a)-(b), 1.1362-2(a).

---

[5] The QSub's status was automatically terminated pursuant to 26 U.S.C. § 1361(b)(3)(B) because it no longer met the statutory requirement of being wholly-owned by an "S" corporation.

As a consequence of becoming a "C" corporation, MSC II became responsible for filing its own tax returns and paying income taxes on its holdings and operations (26 C.F.R. §§ 1.11-1(a); 1.6016-1-1.6016-4), which include the Majestic Star II riverboat casino and the Majestic Star Hotel at Buffington Harbor in Gary, Indiana.  Compl. at ¶¶22, 25.

Neither BDI nor Barden sought or obtained authorization from the Court for the Revocation. *Id.* at ¶ 23.  The Complaint alleges that BDI and Barden did not consult with the Debtors or the Debtors' advisors before the Revocation.  *Id.*  The Debtors did not learn of the termination of MSC II's QSub status until July 19, 2010, which is believed to be at least four months after BDI and Barden filed the Revocation with the IRS.  *Id.* at ¶ 24.

The Debtors allege that because MSC II was not informed about the Revocation, it was unaware that it had a new obligation to report and pay income taxes. *Id.* at ¶ 27. The Debtors allege that due to the change of MSC II's tax status, MSC II has had to pay approximately $2.26 million in estimated income tax to the Indiana Department of Revenue for 2010 that it otherwise would not have had to pay. *Id.*  However, as of April 2011, the Debtors had paid no federal income taxes to the IRS as a result of the Revocation.  If the Debtors owe any federal taxes, they had to make their estimated tax payments for MSC II to the IRS on April 15, 2011.  Additionally, the Debtors had to make their estimated tax payments and penalties for the year ended December 31, 2010, to the Indiana Department of Revenue, on April 20, 2011.  *Id.*

# III. **DISCUSSION**

Debtors seek summary judgment on both counts alleged in the Complaint against all Defendants pursuant to Fed. R. Civ. P. 56(a) and Fed. R. Bankr. P. 7056.  Defendants Indiana Department of Revenue, BDI, Barden, and the IRS have filed oppositions to the Summary Judgment Motion.  Additionally, the IRS has filed a Motion to Dismiss the Complaint for lack of jurisdiction under Fed. R. Civ. P. 12(c), incorporated by Fed .R. Bankr. P. 7012(b), or alternatively F.R. Civ. P. 12(b)(6), for failing to state a claim upon which relief can be granted.  Finally, Defendants Barden and BDI have filed their Motion for Judgment on the Pleadings under Fed. R. Civ. P. 12(c).  With respect to the IRS's Motion to Dismiss and Defendants Barden and BDI's Motion for Judgment on the Pleadings the question is whether the Debtors have sufficiently stated facts which, if proven, would entitle them to relief.  Secondly, with respect to the Summary Judgment Motion, the question is whether there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

*The IRS's Motion to Dismiss*

*Lack of Jurisdiction*

The IRS argues that this Court does not have jurisdiction under § 505(a)(1) over the claims alleged in the Complaint because the Debtors have not alleged that MSC II has not paid any federal corporate income taxes or filed any federal income tax returns.  The IRS argues that the only relief the Debtors seek is restoration of BDI's "S" Corporation status and MSC II's QSub status for use in future tax returns.  As a result, the IRS argues that the request is not yet ripe for review because there is no actual controversy between the parties

6

at this time.  Motion to Dismiss at 2, 4-5.  The IRS argues that in essence, the Debtors "are seeking a ruling concerning MSC II's tax status to assist them in computing their future corporate income tax liabilities."  Motion to Dismiss, at 5.

The Court disagrees with the IRS's argument that it does not have jurisdiction over the Debtors' claims.  The IRS's position is based on a fundamental flaw that the Debtors' claims against the IRS, regard the amount or legality of any tax claim under section 505(a)(1).  The Debtors are not seeking a declaratory judgment of the amount of any tax under section 505(a)(1), rather, the Debtors are seeking to avoid the revocation of MSC II's QSub status as an unauthorized transfer of estate property under § 549.  This Court has jurisdiction under 28 U.S.C. § 157(b)(2) to determine an avoidable transfer under § 549, and the IRS's lack of jurisdiction argument.

### Failure to State a Claim

The IRS also argues that the Motion to Dismiss should be granted because the Debtors failed to state a claim upon which relief can be granted.  A motion to dismiss pursuant to Rule 12(b)(6) serves to test the sufficiency of the factual allegations in a plaintiff's complaint.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, (2007);  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must contain sufficient "factual allegations" which, if true, would establish "plausible grounds" for a claim: "the threshold requirement ... [is] that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.' " *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955.  "To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible.  This then

'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)(quoting *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1948-50)). However, "labels and conclusions" or "formulaic recitation of the elements of a cause of action" are not sufficient. *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. Legal conclusions are not entitled to the presumption of truth. *Ashcroft v. Iqbal*, ––– U.S. ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). In deciding a motion to dismiss under Rule 12(b)(6), a court tests the sufficiency of the factual allegations and evaluates whether a plaintiff is "entitled to offer evidence to support the claims," and "not whether a plaintiff will ultimately prevail." *Oatway v. Am. Int'l Group, Inc.*, 325 F.3d 184, 187 (3d Cir. 2003). This is true even if "actual proof of those facts is improbable" and "a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955.

As discussed above, the Court must accept as true all allegations in the Amended Complaint and draw reasonable inferences in a light most favorable to the plaintiff. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008); *Morse v. Lower Merion School District*, 132 F.3d 902, 905 (3d Cir. 1997). However, "a court need not credit a plaintiff's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Sands v. McCormick*, 502 F.3d 263, 267-68 (3d Cir. 2007) (quoting *Morse*, 132 F.3d at 906).

As discussed in further detail *infra*, the Debtors have alleged sufficient facts which, if accepted as true, establish a plausible ground for a claim that there was a postpetition unlawful transfer of property of the estate that was not authorized under title 11 or by the Court. Therefore, the Defendants' Motion to Dismiss for failure to state a claim is denied.

*Defendants' Barden and BDI's Motion for Judgment on the Pleadings*

Defendants Barden and BDI have filed a Motion for Judgment on the Pleadings under Fed. R. Civ. P. 12(c). The standard for a Rule 12(c) motion is the same as the standard for a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. *In re Fedders North America, Inc.*, 422 B.R. 5 (Bankr. D. Del. 2010) (*citing In re G-I Holdings, Inc.*, 328 B.R.691, 693-94 (D. N.J. 2005); *Children's Seashore House v. Waldman*, 197 F.3d 654, 657 n.1 (3d Cir. 1999). Defendants Barden and BDI argue that the Complaint should be dismissed because the Debtors have failed to identify any cognizable legal theory under which they would be entitled to relief under Sections 549, 550, or 362 of the Bankruptcy Code. First, the Defendants argue that under the IRC, a QSub has no separate tax existence and therefore the QSub has no cognizable property interest under tax law. Second, the Defendants argue that the ability to qualify as a QSub depends entirely on the elections made and tax status of the parent corporation. Therefore, the tax status of the QSub is solely a property right of the parent corporation. Finally, the Defendants argue that the cases holding that a debtor "S" Corporation has a property right in its "S" corporation status are inapposite because those cases did not involve a QSub. Moreover, the Debtors argue that none of those cases which avoid a debtor's revocation of its status as an "S" corporation have been extended to restrict a non-debtor "S" corporation parent of the debtor QSub from exercising its authority to elect or revoke the election of its subsidiaries' tax status.

For purposes of the Motion for Judgment on the Pleadings, the Debtors have alleged sufficient facts which if accepted as true, establish a plausible ground for a claim that there was a postpetition unlawful transfer of property of the estate that was not authorized under title 11 or by the Court.   Therefore, Defendants Barden and BDI's Motion for Judgment on the Pleadings is denied.   The Defendants' substantive arguments are discussed *infra*, in the Court's Summary Judgment discussion.

*Summary Judgment Standard*

Pursuant to Federal Rule of Civil Procedure 56(a), made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, a court may grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute regarding a material fact is genuine "when reasonable minds could disagree on the result" *Delta Mills, Inc. v. GMAC Comm. Fin., Inc. (In re Delta Mills, Inc.)*, 404 B.R. 95, 105 (Bankr.D.Del.2009). The moving party bears the burden of demonstrating an entitlement to summary judgment. *McAnaney v. Astoria Fin. Corp.*, 665 F.Supp.2d 132, 141 (E.D.N.Y.2009).

Summary judgment serves to "isolate and dispose of factually unsupported claims or defenses" and avoid unnecessary trial where the facts are settled. *Delta Mills*, 404 B.R. at 104 (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).  Thus, at the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Pearson v. Component*

*Tech. Corp.*, 247 F.3d 471 (3d Cir. 2001) (*citing Celotex*, 477 U .S. at 317); see also Fed.R.Civ.P. 56(c). In making this determination, the court must view all facts in the light most favorable to the non-movant and must draw all reasonable inferences from the underlying facts in favor of the non-movant. *McAnaney*, 665 F.Supp.2d at 141; *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir.1994). Any doubt must also be construed in the non-moving party's favor. *Delta Mills*, 404 B.R. at 105.

Once the moving party provides sufficient evidence, the burden shifts to the non-moving party to rebut the evidence. *Delta Mills*, 404 B.R. at 105. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *McAnaney*, 665 F.Supp.2d at 141 (*quoting Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002)). "[T]he mere existence of some alleged factual dispute between the parties" cannot defeat a properly supported summary judgment motion. *Anderson*, 477 U.S. at 247–48. The dispute must relate to a genuine issue of material fact. *Delta Mills*, 404 B.R. at 105. Thus, a non-moving party cannot defeat a summary judgment motion based on conclusory allegations and denials, but instead must provide supportive arguments or facts that show the necessity of a trial. *McAnaney*, 665 F.Supp.2d at 141.

Summary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).

The parties' submissions demonstrate that there are no genuine issues of material fact. The issue in this case solely involves issue of law. More specifically, the issue is whether a Debtors' QSub status as a QSub is property of the estate? Under section 549 of the Bankruptcy Code, "the trustee may avoid a transfer of property of the estate that occurs after the commencement of the case; and . . . that is not authorized under [title 11] or by the court." 11 U.S.C. § 549(a); *In re NJ Mobile Dental Practice, P.A.*, 2008 WL 1373706, at *4 (Bankr. D.N.J. Apr. 7, 2008) (section 549 also empowers debtor in possession to avoid post-petition transfers).

### A. Was there an Avoidable Transfer of the Property of the Bankruptcy Estate?

#### 1. Is the Debtors' QSub Status Property of the Bankruptcy Estate?

A bankruptcy estate consists of the debtor's property and it is created at the commencement of the case. *See In re Irwin*, 457 B.R. 413, 418 (Bankr. E.D. Pa 2011); 11 U.S.C. § 541. Section 541 of the Bankruptcy Code broadly defines "property" to include "all legal or equitable interests of the debtor in property as of the commencement of the case." *See Begier v. I.R.S.*, 496 U.S. 53, 58 (1990) (defining an interest of the debtor in property as "that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings."); *United States v. Whiting Pools,* 462 U.S. 198, 204 (1983) ("Both the congressional goal of encouraging reorganizations and Congress' choice of methods to protect secured creditors suggest that Congress intended a broad range of property to be included in the estate."); *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 357 (3d Cir. 2001); 11 U.S.C. § 541(a)(1). "The scope of [§ 541] is very broad and includes property of all descriptions, tangible and intangible."

*In re Central Ark. Broadcasting Co.*, 68 F.3d 213, 214 (8th Cir.1995).

Nonetheless, section 541 of the Bankruptcy Code does not specifically define what constitutes an interest in property. "The legislative history of § 541(a) indicates that it is expansive and includes 'all kinds of property, including tangible or intangible property, causes of action ... and all other forms of property specified in section 70(a) of the Bankruptcy Act.'" *In re Forman Enters., Inc.*, 281 B.R. at 611 (citing *U.S. v. Whiting Pools*, 462 U.S. 198, 205 n. 9, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). "'Generally, property belongs to the debtor ... if its transfer will deprive the bankruptcy estate of something which could otherwise be used to satisfy the claims of creditors.'" *In re Feiler*, 230 B.R. 164, 167 (B.A.P. 9th Cir. 1999) (*quoting In re Bullion Reserve of N. Am.*), 836 F.2d 1214, 1217 (9th Cir. 1988)).

Non-debtor parent BDI's subchapter "S" election under IRC § 1362 resulted in the Debtors' treatment as a QSub under IRC § 1361(b)(3)(B)). As a result of BDI's subchapter "S" election under title 26 § 1362 of the United States Code, federal law will determine whether the Debtors hold a property interest in its QSub status. Numerous federal courts have previously held that a debtor's prepetition status as an "S" corporation is property of the estate. *See Parker v. Saunders (In re Bakersfield Westar)*, 226 B.R. 227, 233-34 (B.A.P. 9th Cir. 1998) (finding that debtor's right to make or revoke its subchapter S status is property of th estate); *In re Frank Funaro Inc. v. Funaro (In re Frank Funaro Inc.)*, 263 B.R. 892, 898 (B.A.P. 8th Cir. 2001) (adopting *Bakersfield* for proposition that debtor has property interest in "S" corporation status); *Walterman Implement Inc. v. Walterman (In re Walterman Implement Inc.)*, 2006 WL 1562401, *3 (Bankr. N.D. Iowa May 22, 2006) (same); *Guinn v. Lines (In re Trans-Lines W., Inc.)*, 203 B.R. 653, 661-62 (Bankr. E.D. Tenn. 1996) (finding that an "S"

13

corporation's tax status constitutes property interest under the Bankruptcy Code); *In re Cumberland Farms, Inc.*, 162 B.R. 62, 66-67 (Bankr. D. Mass. 1993) (finding that the debtor has a property interest in the tax savings that result from its "S" corporation status).

Additionally, some of those courts have held that the "S" corporation's status is property of the estate because of the tax benefits that status confers on the debtor.  *See In re Feiler*, 230 B.R. at 168 (holding that a debtor's right to carry forward or carry back a net operating loss is property of the estate.  The court noted that in addition to the ability to control the right to make or revoke a net operating loss election, the tax benefits resulting from the revocation of the election shifted "an obligation of the debtor-corporation's principals, and payment of those tax liabilities would have diminished estate funds that would otherwise have been available to satisfy the claims of the debtor-corporation's creditors."); *In re Bakersfield Westar*, 226 B.R. at 233-34 ("The ability to not pay taxes has a value to the debtor-corporation in this case . . . [as a result of the revocation of the debtor's "S" corporation status] [t]he debtor's estate will be required to pay the capital gains taxes on an administrative expense priority basis, and its payment of the taxes will diminish the amount of monies that would otherwise be available to satisfy claims of the debtor's remaining creditors."); *In re Cumberland Farms, Inc.*, 162 B.R. at 66-67 (finding that the debtor has a property interest in the tax savings that result from its "S" corporation status).

This Court agrees with other courts that have held that a debtor "S" corporation, or in this case its wholly-owned QSub, has a property interest in the benefits that status affords the debtor, most importantly the ability to pass-through tax liability and the net operating losses to its ultimate shareholders. *Bakersfield,* 226 B.R. at 233-34 (finding that the

debtor had a property interest in its subchapter S status where revocation required estate to pay $400,000 in taxes otherwise owed by shareholders).  In *In re Cumberland Farms, Inc.,* the court had to decide whether the debtor "S" corporation had a property interest in the tax savings that resulted from its "S" corporation status.  *Id.* at 64-65. The court held that the Debtors' "S" corporation had a property interest in the benefit of minimizing future tax payments.  *Id.* at 66-67.

Similarly, the Court in *Bakersfield* in part premised its holding that a debtor's "S" status is estate property on the ground that the revocation of that "S" status would require the debtor's estate to pay taxes that it would otherwise not be required to pay and "diminish the amount of monies available to satisfy claims of the debtor's remaining creditors." 226 B.R. at 234.  *See also In re Feiler*, 230 B.R. at 168 ("As a result of the revocation, the estate's substantial capital gains tax liabilities became an obligation of the estate and its creditors, rather than remaining an obligation of the debtor-corporation's principals, and payment of those tax liabilities would have diminished estate funds that would otherwise have been available to satisfy the claims of the debtor-corporation's creditors. *Id.* at 168 (*quoting In re Bakersfield Westar*, 226 B.R. at 230, 233-34).  Consequently, because the debtor-corporation's subchapter "S" status provided the debtor-corporation the ability to pass-through capital gains tax liabilities to its principals, the right to make or revoke its subchapter "S" status had value to the debtor and constituted property or an interest of the debtor in property. *Id.*

As established by the case law, a wholly-owned QSub, like an "S" corporation, has a property interest in the benefits that status affords the debtor, most notably the right of the estate to be free of a heavy tax burden that will "diminish estate funds that would otherwise have been available to satisfy the claims of the debtor-corporation's creditors." *In re Feiler*, 230 B.R. at 168; *See also In re Bakersfield Westar*, 226 B.R. at 230.

As a Qsub, the Debtors enjoyed a special tax status that allowed them to pass-their its taxable income and net operating losses to its shareholders. The significance of this benefit is not lost on the Court. Prior to the Revocation, all of the Debtors' net operating losses flowed up from MSC II to BDI, and then ultimately to Defendant Barden. As the controlling shareholder of multiple pass-through "S" corporate entities (BDI and the Debtors), Barden received an enormous tax benefit. Barden, as the sole shareholder of BDI and CEO of BDI and each of the Debtors, elected to treat BDI as an "S" corporation in 2005. After this initial election, Barden, who controlled BDI, then had BDI elect to treat its wholly-owned subsidiary, MSC II, as a QSub under IRC § 1361(b)(3)(A). The net tax effect of these elections is that all of the income and losses of the underlying "S" corporations flowed up to Barden and allowed Barden to enjoy the benefits of the Debtors' prepetition net operating losses to offset his personal income tax.

Conversely, once the Debtors filed for bankruptcy protection, BDI's "S" corporation status and the QSub status no longer benefitted Barden. Postpetition, as a result of the "S" corporation election and QSub election, Barden was faced with the very real possibility of having to pay ordinary income taxes and capital gains taxes on the pass-through treatment of the Debtors' income and potential sale of assets of his companies. The Revocation of

16

BDI's "S" status and, by operation of the IRC, the Debtors' QSub's status, helped Barden to avoid potentially negative tax consequences.  By operation of the IRC and Treasury Regulations, the Revocation of BDI's "S" status automatically terminated MSC II's QSub status and converted both entities into "C" corporations.  The result was the reversal of the beneficial prepetition flow-through treatment of net operating losses to the controlling shareholder, Barden.  26 U.S.C. §§ 1361(b)(3)(B)-(C), 1362(d); 26 C.F.R. §§ 1.1361-4(a), 1.1361-5(a)-(b), 1.1362-2(a).

The Court disagrees with the Defendants that the Revocation merely caused collateral change to MSC II.  The Revocation was not a change without significance. The affect of the Revocation is that a potentially significant tax burden was shifted from Barden, as controlling shareholder of pass-through "S" corporation entities, back to the Debtors. As a result of the Revocation, potential tax liabilities became an obligation of the estate and its creditors, and the payment of those tax liabilities will diminish estate funds that would have been available to satisfy creditors' claims.

The *Bakersfield* Court aptly addressed this type of attempted bankruptcy tax planning; "[t]hus, the decision to revoke the debtor's sub-chapter S status appears to reflect careful tax planning, and the Revocation appears to represent an effort by the Saunders to manipulate the bankruptcy system to their personal advantage under the guise of professional tax planning." *Bakersfield*, 226 B.R. at 236.  Here, the Debtors as a wholly-owned QSub have a property interest in that status under § 541 of the Bankruptcy Code because of the significant tax benefits it provided them, namely, to pass-through income and loss to its sole shareholder, Barden.  Defendant Barden enjoyed the benefits of the "S"

corporation election and QSub election through his ability to utilize the Debtors' net operating losses to offset his own personal income. Now he must also bear the burden of any post-petition tax liabilities attributable to the Debtors. After the Revocation of the Debtors' QSub status, a potentially significant tax liability has been transferred back to the estate and will reduce the creditors' recovery. The Debtors' status as a QSub has very real and significant value and is property of the estate. Debtors were damaged by the Revocation under the guise of tax planning.

Defendants Barden, BDI, and the IRS argue that the QSub has no property interest in its tax status because the QSub has no separate for tax purposes from the "S" corporation. QSub status is dependent on an election of the "S" corporation parent. The Court disagrees that a QSub cannot have a property interest in its tax status because the decision to elect or revoke that tax status is held by a non-debtor. The Second Circuit has held that property interests include rights that may be intangible and/or contingent on a non-debtor's actions. *See e.g. Official Committee of Unsecured Creditors v. PSS Steamship Co. (In re Prudential Lines Inc.),* 928 F.2d 565, 570 (2d Cir. 1991) (rejecting the non-debtor parent's argument that because the debtor was a subsidiary member of a consolidated group, the common parent of that group, and not the debtor, controlled the group's use of the net operating losses. The Second Circuit affirmed the bankruptcy court's order enjoining a non-debtor parent corporation from taking a stock deduction that would have prevented its debtor subsidiary from claiming its net operating losses.). The Third Circuit has also held that "[p]roperty of the estate 'includes all interests, such as . . . contingent interests and future interests, whether or not transferable by the debtor.'" *Pension Transfer*

*Corp. v. Beneficiaries Under Third Amendment to Fruehauf Trailer Corp. Ret. Plan (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 211 (3d Cir. 2006) (quoting *Prudential*, 928 F.2d at 572). Despite the fact that MSC II's QSub status is dependent on an election of the non-debtor "S" corporation, BDI, MSC II has a property interest in its QSub status.

The IRS argues that the cases the Debtors cite for the proposition that an "S" corporation's subchapter S status is property of the estate do not support the Debtors' arguments because the holdings in each of those cases were based on the rationale that an "S" corporation has the right to make or revoke its subchapter S status. IRS Reply Brief at 8-9 (D.I. 50). The IRS argues that unlike "S" corporations, QSubs do not have the right to make or revoke their QSub tax status, "[r]ather, the QSub's status depends entirely on the actions of their parent corporation." *Id.* at 9. The IRS asserts that the cases Debtors cite are inapposite.

The Court disagrees with the Defendant's contention that because the Qsub does not have the right to make or revoke its QSub status, that the QSub does not have a property interest in its tax status. IRC § 1362(a) provides that a small business corporation can elect to be treated as an "S" corporation and that the election is only valid if all of the shareholders consent to the "S" corporation election. *See* 26 U.S.C. § 1362(a)(1)-(2). In conjunction with IRC § 1362(a) governing "S" corporation election, IRC § 1361(b)(3)(B) defines what qualifies as a wholly-owned qualified subchapter "S" subsidiary. IRC § 1361(b)(3)(B) provides that the subsidiary will be treated as a QSub if (1) it is wholly-owned by an "S" corporation, and (2) the "S" corporation elects to treat the subsidiary as a qualified subchapter S subsidiary. IRC § 1361(b)(3)(B). Although MSC II's QSub status was

dependent on BDI's election, *Prudential* established that a property interest may exist even if contingent on a non-debtor's actions.   MSC II's interest in the QSub status was property of the estate.

Furthermore, regardless that the IRC provides that the "S" corporation or QSub elections are controlled by the "S" corporation, the reality is that both elections are controlled by the principal shareholders of the "S" corporation.  In a corporate group such as the Debtors, with wholly-owned subsidiaries owned by a single principal shareholder, this reality becomes even more clear.   Defendant Barden is the sole shareholder and principal of BDI, the "S" corporation.   BDI in turn owns one hundred percent of MSC II, the QSub.   Although BDI elected to treat MSC II as a QSub, in reality that decision was made by BDI's sole shareholder, Defendant Barden.  The same applies to the Revocation.

Finally, the Defendants' argument that the Debtors' "S" corporation cases are inapposite is not persuasive.   The Defendants' argument presumes that the holdings that an "S" corporation has a property interest in its "S" corporation status were based exclusively on the rationale that an "S" corporation has the right to make or revoke its subchapter "S" status, and those rights are what constituted an interest of the debtor in property.  The Defendants argue that because a QSub does not have the right to make or revoke its QSub status, the holdings on the "S" corporation decisions are inapplicable.

The Court disagrees.  The fact that the "S" corporation has the right to make or revoke its subchapter S status was not the only rationale and basis for the rulings that an "S" corporation has a property interest in its "S" corporation status.  As expressed in the decisions, those courts also gave consideration to other factors such as the benefit that the

status conferred on the estate.  This includes minimizing tax liability and avoiding the shifting of a tax burden from the principal shareholder back onto the estate and the estate's creditors.  *See In re Bakersfield Westar*, 226 B.R. at 234; *In re Cumberland Farms, Inc.*, 162 B.R. at 66-67; *In re Feiler*, 230 B.R. at 168 (holding that a debtor's right to carry forward or carry back a net operating loss is property of the estate while also noting that in addition to the ability to control the right to make or revoke a net operating loss election, the tax benefits resulting from the revocation of the election shifted "an obligation of the debtor-corporation's principals, and payment of those tax liabilities would have diminished estate funds that would otherwise have been available to satisfy the claims of the debtor-corporation's creditors.").

The cited cases which premise holdings on the tax benefits that the "S" corporation status conferred on the debtors, apply equally to both "S" corporations and QSubs.  Like an "S" corporation, a QSub benefits from its status as a pass through entity.  The primary benefit is that all income earned by the QSub is passed through and up to the "S" corporation and then further passed on to the "S" corporation shareholders.  The ability to minimize or eliminate tax liability is a significant benefit to the estate and will help preserve a larger portion of estate funds to satisfy creditors' claims.   *See In re Feiler*, 230 B.R. at 168; *See also In re Bakersfield Westar*, 226 B.R. at 230.  The fact that the QSub does not itself have the ability to make or revoke its QSub status is a statutory anomaly.   As explained *infra*, the right to make or revoke the election to be treated as an "S" corporation is in reality controlled by the corporation's shareholders and they equally control the right of the QSub to be treated as a QSub by having the "S" corporation make the § 1361(b)(3)(B)

election for Qsub treatment.  Therefore, the case law that takes into consideration the benefits that the "S" corporation's status conferred on the Debtors in determining that the status is property of the estate is equally applicable to Qsubs.  As a result, the Court holds that a wholly-owned QSub has a property interest in the tax benefits that status affords the debtor, most notably the right to be free from a heavy tax burden, and the right to prevent a shifting of tax liability from the shareholders to the QSub through a revocation of the "S" corporation's status, that by operation of the IRC revokes the QSub's status.

### 2. *Was the Revocation of BDI's "S" Corporation Status and Termination of the Debtors' QSub Status a Transfer?*

BDI's revocation of its "S" corporation status automatically terminated MSC II's QSub status by operation of 26 C.F.R. §§ 1.1361-5(a)(ii), 1.1362-2(a).  BDI and Barden do not dispute they revoked BDI's status as an "S" corporation.  The legal issue is whether this revocation and automatic termination resulted in a transfer under Bankruptcy Code § 549. The Bankruptcy Code broadly defines transfer to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property."  11 U.S.C. § 101(54).  The courts in *Bakersfield* and *Trans-Lines* both found that because the revocation of a debtor's status as an "S" corporation is an irrevocable election under the IRC, the revocation is a transfer of the debtor's property under the Bankruptcy Code.  *See e.g., Bakersfield*, 226 B.R. at 233-36; *Trans-Lines*, 203 B.R. at 661-63.  Similarly, in the present case the Defendants' Revocation of BDI's "S" corporation status, automatically and irrevocably terminated MSC II's QSub status and as a result the Revocation caused a transfer of property from the bankruptcy estate.

### 3. Did the Transfer Occur Post-Petition?

Both BDI and Barden admit that they revoked BDI's "S" corporation status after the petition date. BDI/Barden Answer at ¶ 21. Therefore there is no genuine dispute that the revocation and the transfer occurred post-petition.

### 4. Was the Transfer Unauthorized?

Both BDI and Barden admit that they made the Revocation without seeking permission or notifying the Court or the Debtors. BDI/Barden Answer at ¶ 23. Additionally, the revocation was not authorized by any provision of the Bankruptcy Code. Therefore, the Revocation was unauthorized and avoidable pursuant to § 549 of the Bankruptcy Code.

### B. Was The Revocation a Violation of the Automatic Stay?

The Court will grant the Debtors' Motion for Summary Judgment as to Count II of the Complaint because the Revocation violated the automatic stay imposed by Section 362 of the Bankruptcy Code. Section 362 of the Bankruptcy Code prohibits any act "to exercise control over property of the estate," including the post-petition transfer of the debtor's property. 11 U.S.C. § 362(a)(3). Any act in violation of the stay is void and has no effect. *See e.g., In re Hull,* 2003 WL 22000599, at *1 (Bankr. D. Del. 2003).

The automatic stay is violated "where a non-debtor's action with respect to an interest that is intertwined with that of a bankrupt debtor would have the legal effect of diminishing or eliminating property of the bankrupt estate." *Prudential*, 928 F.2d at 574. A wholly-owned QSub has a property interest in the tax benefits that status affords the debtor, most notably the right of the estate to be free of a heavy tax burden that will

diminish creditors' recovery, and any postpetition act that causes the debtor to lose this status is an act to exercise control over property of the estate. *See Walterman Implement Inc. v. Walterman (In re Walterman Implement Inc.),* 2006 WL 1562401, at*3; *In re Feiler,* 230 B.R. at 168; *Cumberland*, 162 B.R. at 68.

The Defendants' revocation of BDI's "S" corporation status which automatically terminated the Debtors' QSub status was an exercise of control over the Debtors' property in violation of § 362.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons the Court will GRANT the Debtors' Summary Judgment Motion as to Counts I and II with the relief set forth in the accompanying Order.

In addition, Defendant IRS's Motion to Dismiss is DENIED; and Defendants Barden and BDI's Motion for Judgment on the Pleadings is DENIED.

Dated: January 24, 2012

KEVIN GROSS, U.SB.J.